IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| Gallant Industrial Services, Inc. : | |
| : | Case No. C-1-02-179 |
| Plaintiff : | |
| : | District Judge Susan J. Dlott |
| v. : | |
| : | ORDER |
| Coolant Control, Inc. : | |
| : | |
| Defendant : | |

This matter comes before the Court on Defendant Coolant Control, Inc.'s Motion for Summary Judgment (doc. #19) and Plaintiff's Motion for Partial Summary Judgment (doc. #20.) For the following reasons, the Court **DENIES** both motions.

**I.     FACTUAL BACKGROUND**

This case arises from a settlement agreement entered into between Plaintiff Gallant Industrial Services, Inc. ("Gallant") and Defendant Coolant Control, Inc. ("CCI") in resolving a prior lawsuit filed in this Court by CCI.  Before discussing the details of the settlement, the Court will outline the background against which the parties entered into that agreement, namely, the parties' commercial relationship with a Ford Motor Company ("Ford") engine plant in Dearborn, Michigan ("the Plant").

### A.    Parties' Relationship with the Ford Plant

Gallant and CCI are competitors in the industrial coolant industry.  Historically, Gallant provided products and services to the Plant under direct contract with Ford.  CCI products are also approved by Ford for use at the Plant.

In mid-1999, Ford initiated a cost-reduction program called the Total Fluids Management Program.  Ford selected Houghton International, Inc., Fluid Care Division's predecessor in interest, Bencyn, Inc. (collectively, "Houghton"), as its "Total Fluids Manager."  The evidence shows that Houghton found Gallant's prices to be too high and concluded shortly after taking over as Total Fluid Manager that the Plant should no longer utilize Gallant's products and services.  As early as July of 1999, Houghton told Gallant that Houghton thought Gallant's prices were relatively high.  (Doc. #19, Brenan Aff. ¶ 9 exhs. A-B.)  The president of Houghton also testified by affidavit that "[i]t was always our intent to eliminate Gallant's Tier II services as based on our experience their costs were higher than we believed we could operate the systems." (Id. ¶ 7.)  In August of 1999 Houghton informed Gallant that Houghton had assumed responsibility for all chemical processes at the Plant.  (Doc. #19, Pacheco Aff. exh. A.)  However, Gallant representatives testified that they thought that Houghton had lacked authority over Gallant.  (J. Gallant, Jr. dep. at 20-21; J. Gallant, Sr. dep. at 18-19.)

### B.    The Settlement Agreement

In June of 2000, CCI filed suit in this Court against Gallant, alleging misappropriation of trade secrets and breach of contract.  At the close of the first day of the Court's November 2000 hearing on CCI's request for a preliminary injunction, the parties agreed to a settlement that would resolve that case.  In the written Settlement Agreement and Release (the "Settlement

Agreement"), Gallant agreed to pay CCI a certain sum in settlement for mutual release of claims. (Doc. #19 exh. 1 ¶¶ B(6), (12)(a).) Each party acknowledged and agreed to maintain certain proprietary and trade secrets of the other. (Id. ¶¶ B(12)(b)-(e).) Of particular relevance to this litigation, at Paragraph B.12(f)(ii) ("the Non-Compete Provision") CCI also agreed that it would not:

> sell or offer to sell any products or services to or solicit any business from the Ford Dearborn Engine Plant (including, without limitation, knowingly selling or offering to sell any products or services to or soliciting business from any direct or indirect supplier or vendor to the Ford Dearborn Engine Plant and shall further refuse to sell products or services to any entity if it learns that the products or services are intended for use in the Ford Dearborn Engine Plant), for a period of five (5) years from the date of this Settlement Agreement.

(Id. ¶ B(12)(f)(ii).) With respect to disclosure of the terms of the settlement to third parties, the Settlement Agreement provided that "the parties shall have the right to disclose to Houghton International, Inc., Ford Motor Company and Master Chemical, Inc. the fact of settlement and of the restrictions placed on the parties as set forth in Paragraph B.12(f)(i) and (ii)." (Id. ¶ B(12)(g).) Otherwise, the terms and amount of the settlement were confidential. (Id. ¶ B(7).)

    C.    **Compliance With the Settlement Agreement**

Initially, CCI told some people possibly affected by the Non-Compete Provision of its existence, but not others. CCI did not inform Ford of the restrictions until approximately one year after the signing of the Agreement. (Ferraris dep. at 50-51.) Within a few weeks after execution of the Settlement Agreement, CCI informed Houghton, one of its distributors, of the Non-Compete Provision. However, CCI did not inform Castrol and Chrysan, other distributors of CCI products, of the restrictions until March 2003, after this lawsuit was filed. (Costa dep. at 21;

Ferraris dep. at 200-202; doc. #20 exh. 4 at dep. exh. 36.)  Additionally, the circle of persons at CCI who knew about the terms of the Settlement Agreement was small.

Perhaps as a result, undisputedly some CCI products have reached the Plant since the parties signed the Settlement Agreement.  In early December 2000, four drums of CCI's Surfaid product were received at the Plant.  Consequently, by letter between counsel dated January 4, 2001, Gallant told CCI that Gallant believed that CCI was selling its products to Houghton and/or Castrol for use in the Plant and was "drop-shipping products directly to the Dearborn plant." (Doc. #19 exh. 3.)  CCI promptly apologized through letter from counsel, confirming that one order of CCI product was shipped "directly" to the Plant.  (See id. exh. 4.)  The letter characterized the shipment as "inadvertent" and due to the fact that one CCI employee was not aware of the restrictions contained in the Settlement Agreement and had improperly processed an order.  (Id.)

Upon receipt of the January 4 letter, CCI principals followed up with some CCI employees about preventing violations of the Non-Compete Provision, may have followed up with Houghton, but did not follow up with Castrol.  CCI president Garry Ferraris testified that CCI did not discuss the Non-Compete Provision with Castrol because CCI did not think that Castrol was involved with the Plant. (Ferraris dep. at 25-28.)  It is unclear from the testimony whether CCI informed Houghton of Gallant's January 4 letter and told them to stop shipping CCI products to the Plant.  (Ferraris dep. at 28-29, 77-78, 217.)  Additionally, Mr. Ferraris sent a memorandum to several CCI employees informing them about the Non-Compete Provision. (Doc. #19 exh. 5.)  The letter stated that "[i]n the future, all orders placed by Houghton or Houghton Fluid Care, regardless of what product or ship-to location must be approved by either

me or [CCI CEO] Jorg Costa before shipping." (Id.) CCI representatives also testified that from that point forward, Mr. Ferarris personally reviewed every order placed by Houghton. (Id.; Ferraris dep. at 81-83, 115; Costa dep. at 31-32.) However, there is also testimony suggesting that CCI did not examine its purchase orders from Houghton to determine which ones related to the Plant, although it is unclear from the evidence whether CCI could have ascertained a final shipping destination from such an examination. (Ferraris dep. at 78, 93, 114-28, 225-27; J. Gallant, Sr. dep. at 85-86.)

Nonetheless, CCI continued to sell to distributors CCI product that ended up in the Plant. By letter dated July 12, 2001, Gallant informed CCI that Gallant believed that CCI products were being shipped to the Plant by Houghton via JC Trucking. (Doc. #19 exh. 6, 7.) Enclosed with the letter was documentary evidence in the form of a packing slip. (Id. exh. 7.) Mr. Ferraris testified that until receipt of this letter, CCI did not know that Houghton had been delivering CCI products to the Plant. (Ferraris dep. at 104-05.) He also testified that CCI was not aware of any further shipments of its products to the Plant through Houghton, via JC Trucking, until Gallant filed this lawsuit. (Id. at 141-42.) Additionally, the president of Houghton testified by affidavit that while Houghton purchased CCI products with the intent to ship them to the Plant via JC Trucking, Houghton "did not inform CCI of our intent to ship CCI product to [the Plant] consistent with our practices of not divulging our clients to our suppliers" and that "CCI did not sell or offer to sell any products or services to us when there was any discussion, agreement, or understanding that such products or services would be sold by Houghton to [the Plant]." (Doc. #19, Brenan Aff. ¶¶12-13.)

After receipt of the July 12 letter, CCI promptly wrote a letter to Houghton asking it to refrain from ordering CCI products for distribution to the Plant, warning that failure to do so would result in CCI discontinuing the sale of products to Houghton. (Doc. #20 exh. 4 at dep. exh. 10.) CCI never contacted Ford about the July 12 letter, however. (Ferraris dep. at 96.) Even after Gallant made additional inquiries with CCI, undisputedly CCI products continued to reach the Plant.

### D. The Deterioration of Gallant's Relationship with the Plant and the Filing of this Lawsuit

On September 26, 2001, the Plant manager sent a letter to Gallant and Houghton affirming that Houghton had the authority and responsibility to reduce fluid costs in support of quoted cost savings to Ford, including, but not limited to, "managing all, including Gallant, Tier 2 supplier services as well as product costs." (Doc. #19 exh. E.) Houghton followed up with a letter the next day, asking Gallant for a price quote and instructing it to "not ship additional product into this plant without a Houghton purchase order." (Id. exh. EE.) By November 15, 2001, Gallant had ceased supplying goods and services to the Plant. (T. Gallant dep. at 87.)

On March 13, 2002, Gallant filed this lawsuit, seeking monetary, declaratory and injunctive relief. (See doc. #1.) The claim for damages is brought under a breach of contract theory. Gallant seeks "damages occasioned by Gallant's lost profits and other damages caused by CCI's breaches" of the Settlement Agreement, as well as "return of all or part of" the money that Gallant paid CCI pursuant to the Settlement Agreement. (Id. ¶ 41.) Gallant also asked for punitive damages in the Complaint (id. ¶ 52) but has since withdrawn that claim. (See doc. #22 at 20.) Thus, the Court will deny as moot CCI's motion for summary judgment with respect to Gallant's claim for punitive damages. Gallant also seeks a declaration that it has complied with

the Settlement Agreement while CCI has breached the Agreement; that "CCI must immediately account to Gallant for all products or services it has sold or offered to sell, or solicited business from either directly or indirectly, through suppliers or vendors (including without limitation Houghton), for the Ford Dearborn Engine Plant, since entering into the Settlement Agreement"; that "CCI must be compelled to comply with its obligations under the Settlement, specifically Paragraph B(12)(f)(ii)"; and that CCI must stop selling products or services to Houghton.  (Doc. #1 ¶ 46.)  Gallant also asks for an injunction prohibiting CCI, as well as those working in concert with it (including Houghton), from violating the Settlement Agreement.  (See id. ¶ 49.)  The Court has subject matter jurisdiction based on diversity of citizenship.  (See id. ¶¶ 3-5.)

There is evidence that since the filing of this lawsuit, CCI has taken steps to prevent the shipment of its products into the Plant.  After Gallant filed suit, CCI informed Houghton that CCI would no longer sell to Houghton products ordered by or through JC Trucking, and Mr. Ferraris testified that CCI has not used JC Trucking since.  (Doc. #19, Brenan Aff. ¶14, exh. E; Ferraris dep. at 58-59.)  Also, Mr. Ferraris testified that in the course of discovery in this lawsuit, CCI saw documents informing it that Castrol and Chrysan had distributed CCI products to the Plant.  (Ferraris dep. at 24-25, 38-39.)  As noted, supra, CCI thereafter informed Castrol and Chrysan of the Non-Compete Provision.  CCI representatives testified that they thought that Castrol and Chrysan would respect CCI's request that they not ship CCI products into the Plant. (Costa dep. at 26; Ferraris dep. at 211-12.)

II.   STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c).  On a motion

for summary judgment, the movant has the burden of showing that there exists no genuine issue of material fact, and the evidence, together with all inferences that permissibly can be drawn therefrom, must be read in the light most favorable to the party opposing the motion. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The nonmoving party "must set forth specific facts showing there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The task of the Court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). A genuine issue for trial exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." Id. at 252.

### III.    ANALYSIS

The Court will first examine the parties' motions for summary judgment with respect to Gallant's breach of contract claim.

#### A.    Breach of Contract

The parties agree that Ohio law governs Gallant's breach of contract claim. Under Ohio law, "a breach of contract occurs when a party demonstrates the existence of a binding contract or agreement; the nonbreaching party performed its contractual obligations; the other party failed to fulfill its contractual obligations without legal excuse; and the nonbreaching party suffered damages as a result of the breach." Garofalo v. Chicago Title Ins. Co., 661 N.E.2d 218, 226 (Ohio Ct. App 1995), quoted in Laurent v. Flood Data Servs., 766 N.E.2d 221, 225 (Ohio Ct. App. 2001). CCI argues that it is entitled to summary judgment on Gallant's breach of contract claim because 1) CCI did not fail to fulfill its obligations under the Settlement Agreement, i.e., there was no breach on its part, 2) any breach on CCI's part was immaterial, and 3) Gallant

suffered no damages as a result of any breach by CCI. Gallant also moves for summary judgment on its breach of contract claim.

Determination of whether a breach occurred requires interpretation of the Settlement Agreement. The construction of written contracts is a matter of law. See Graham v. Drydock Coal Co., 667 N.E.2d 949, 952 (Ohio 1996). Thus, if there is no dispute of material fact, the Court may grant summary judgment to one of the parties. The purpose of contract construction is to determine the intent of the parties, which is presumed to be found in the plain language of the agreement. See id. "Of course, a contract must not be interpreted in a manner which leads to an absurd result." Waste Mgmt., Inc. v. Rice Danis Indus. Corp., 257 F. Supp. 2d 1076, 1083 (S.D. Ohio 2003) (citing cases).

The relevant portion of the Settlement Agreement provides that CCI may not "knowingly" sell products or services that are destined for the Plant. The Court agrees with Gallant that the "knowingly" term does not permit CCI to skirt the Non-Compete Provision by avoiding knowledge of the fact that its products were being distributed to the Plant through adoption of a "don't ask, don't tell" policy. Otherwise, the Non-Compete Provision would be almost meaningless. On the other hand, the "knowingly" term requires that CCI not be held strictly liable for a shipment of its product to the Plant that CCI could not have anticipated. Otherwise, the "knowingly" term would be meaningless.

Applying this interpretation of the Settlement Agreement to the evidence before the Court, the Court finds that several issues of fact pertaining to whether CCI breached the Agreement prevent Gallant from obtaining summary judgment on its breach of contract claim. In general, there is a dispute of fact as to whether CCI knew that its products were being shipped

to the Plant. Specifically, there are disputes of fact as to whether 1) CCI believed that Castrol did not distribute to the Plant and thus did not need to be informed about the Settlement Agreement, 2) CCI believed that it could trust Houghton to abide by CCI's request not to distribute CCI products to the Plant, 3) Houghton told CCI that it was going to ship CCI products to the Plant, 4) CCI reviewed purchase orders from Houghton, and 5) review of the Houghton purchase orders would have revealed to CCI that its products were being shipped to the Plant. In short, the Court cannot decide whether CCI breached the contract without making credibility assessments, which is improper at this stage. Since the occurrence of a breach is an essential element of a breach of contract claim, Gallant cannot obtain summary judgment on this claim.

However, CCI also seeks summary judgment on Gallant's claim on the ground that any breach of the Settlement Agreement on its part was immaterial. However, materiality of a breach matters only where a party claims that he need not comply with the terms of a contract because the other party has breached it first. See Waste Mgmt., 257 F. Supp. 2d at 1084 ("Under Ohio law, a non-breaching party to a contract is excused from complying with conditions of the contract, when the party for whose benefit the condition operates has already materially breached the contract."); Software Clearing House, Inc. v. Intrak, Inc., 583 N.E.2d 1056, 1060 (Ohio Ct. App. 1990) (per curiam) ("A breach of a portion of the terms of a contract does not discharge the obligations of the parties to the contract, unless performance of those terms is essential to the purpose of the agreement."). See also Ohio Jury Instructions–Civil § 253.01, Comment ("A plaintiff is entitled to recover damages for a breach by the defendant, whether or not the breach is material. However, if the defendant's breach is not material, the plaintiff is not excused from performing his/her duties under the contract.") (citations omitted). Here, Gallant does not claim

that it is excused from compliance with the terms of the Settlement Agreement as a result of a breach by CCI. Rather, it seeks damages resulting from the alleged breach. While the nature of any breach by CCI might indicate that Gallant is not entitled to a return of the full amount that it paid pursuant to the Settlement Agreement even if it proves a breach, CCI cannot obtain summary judgment on the ground that any breach was not material.

Finally, CCI argues that it is entitled to summary judgment on Gallant's breach of contract claim because Gallant cannot establish with reasonable certainty that it lost profits as a result of any breach by CCI. CCI points to evidence that Ford did not terminate Gallant as a supplier to the Plant as a result of any action by CCI but as a result of Gallant's relatively high prices. Setting aside the issue of whether Gallant can prove that CCI's actions or omissions caused the deterioration of Gallant's relationship with the Plant, the issue of whether Gallant can prove that it lost Plant business as a result of shipments of CCI products to the Plant remains. In other words, for every unit of CCI product that arrived at the Plant, Gallant may have lost an opportunity to sell a unit of its own product to the Plant. While there is certainly some question as to whether Gallant might have obtained all of this business, CCI has not proven that Gallant would have obtained none of it. Thus, CCI's motion for summary judgment must be denied as to Gallant's breach of contract claim.

### B.     Injunctive Relief

Gallant also seeks injunctive relief. Generally, in considering whether to issue a permanent injunction, a district court must consider the same factors as when determining whether to issue a preliminary injunction: 1) whether the movant has a strong likelihood of success on the merits, 2) whether the movant would suffer irreparable injury without the

injunction, 3) whether issuance of the injunction would cause substantial harm to others, and 4) whether the public interest would be served by issuance of the injunction, as well as two additional factors: 1) whether the plaintiff will suffer a continuing irreparable injury if the court fails to issue the injunction, and 2) the lack of an adequate remedy at law.  See United States v. Szoka, 260 F.3d 516, 523 (6th Cir. 2001).

      CCI argues that it is entitled to summary judgment on Gallant's claim for injunctive relief because CCI poses no threat of irreparable harm since it does not claim that it may sell products to the Plant and since there is no evidence that CCI intends to sell products to the Plant.  However, Gallant does not request an injunction that prohibits CCI merely from selling products directly to the Plant.  Gallant requests an injunction prohibiting CCI from violating the Settlement Agreement, which provides that CCI must "refuse to sell products or services to any entity if it learns that the products or services are intended for use in" the Plant.  As discussed, supra, there is a dispute of fact as to whether CCI knows or has reason to believe that its distributors, such as Houghton, are shipping CCI products to the Plant or will do so in the future.  Additionally, Gallant seeks an injunction prohibiting those acting in concert with CCI, including Houghton, from violating the Settlement Agreement.  CCI does not claim that it cannot and will not sell its products to Houghton.  Thus, CCI cannot obtain summary judgment on Gallant's claim for injunctive relief on the ground that CCI does not claim that it can sell its products to the Plant.

      CCI also argues that it is entitled to summary judgment on this claim on the ground that an adequate legal remedy for any threatened harm would exist in the form of money damages.  CCI points to the fact that Gallant has retained an expert and submitted a report quantifying its

alleged damages to date as evidence of this point.  However, CCI has also argued that any evidence of damages is not proof of the requisite level of reasonable certainty.  Indeed, damages flowing from the breach of a non-competition covenant are often difficult to calculate and thus can constitute irreparable harm.  See Basicomputer Corp. v. Scott, 973 F.2d 507, 512 (6th Cir. 1992).  Therefore, if CCI and its distributors were to continue to allow CCI products to enter the Plant, it might be difficult for Gallant to obtain a legal remedy in the form of monetary damages for any injury that might accrue to it as a result.  Thus, CCI cannot obtain summary judgment on Gallant's claim for injunctive relief.

    **C.**    **Declaratory Relief**

Finally, CCI moves for summary judgment on Gallant's claim for declaratory relief.  The Declaratory Judgment Act, 28 U.S.C. § 2201, provides the statutory basis for a United States district court's jurisdiction over a claim for declaratory relief.  See 28 U.S.C. § 2201 ("any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought").  Showing regard for the dictates of Article III, 28 U.S.C. § 2201 by its text requires that there be an "actual controversy" for a court to have subject matter jurisdiction over a declaratory relief action brought pursuant to the statute.  Whether there is an "actual controversy" depends on "whether the facts alleged, under all the circumstances, show that there is substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."  Md. Cas. Co. v. Pac. Coal & Oil Co., 312 U.S. 270, 273 (1941), cited in Found. for Interior Design Educ. Research v. Savannah Coll. of Art & Design, 244 F.3d 521, 526 (6th Cir. 2001).

CCI contends that declaratory relief is inappropriate for reasons similar to those reasons it offers for why injunctive relief is inappropriate – namely, that since CCI does not claim that it is entitled to sell products to the Plant, there is no "actual controversy."  However, as explained supra, CCI's ability to sell products to the Plant is not the only issue raised by Gallant's claims for equitable relief.  In particular, Gallant seeks a declaration that CCI must stop selling products or services to Houghton.  CCI has not represented that it will not sell products or services to Houghton.  Thus, CCI is not entitled to summary judgment on Gallant's claim for declaratory relief on the argument that there is no "actual controversy" in that CCI does not claim that it can sell products to the Plant.

### IV.     CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendant Coolant Control, Inc.'s Motion for Summary Judgment (doc. #19) and **DENIES** Plaintiff's Motion for Partial Summary Judgment (doc. #20.)

IT IS SO ORDERED.

                                                                                 s/Susan J. Dlott
                                                                                 Susan J. Dlott
                                                                                 United States District Judge